[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION STATEMENT OF THE CASE
The plaintiff, New Haven Country Club Corporation (NHCC), appeals a decision of the Employment Security Board of Review, which modified the decision of the Appeals Referee, in part, by determining that Paul E. Tiedemann was an employee of NHCC with respect to the Club's driving range and golf cart/caddie programs. Following an appeal heard on the record pursuant to § 31-249 of the General Statutes, the Board of Review modified the decision of the Appeals Referee and remanded the case back to the Referee for additional findings of fact concerning benefits due to Tiedemann. The defendant, the Administrator of the Unemployment Compensation Act represents the Board of Review in this action. Tiedemann, the former golf pro at NHCC, is also a defendant. When making its determination, the Board of Review acted pursuant to General Statutes § 31- 249. The NHCC appeals the Board of Review's decision pursuant to §31-249b of the General Statutes.
 FACTS
NHCC is open only to members and their guests; the Club's golf course and driving range are not available to the general CT Page 12634 public. (Transcript, p. 45).[1] To meet the golfing needs of members, NHCC had a Golf Committee, a Greens Committee, and a Greens Superintendent who ran the golf course, as well as a head golf professional, who was in charge of the Club's golf operations. (Tr., p. 90) Paul Tiedemann was employed at the New Haven Country Club as the Head Golf Professional from November 1, 1988 through December 31, 1995. As head golf professional, Tiedemann was viewed by the NHCC as a "Department Head." (Tr., pp. 142, 154) However, the Board of Governors and the Golf Committee oversaw Tiedemann and golf operations at the Club; (Tr., p. 91); and the Golf Committee set Tiedemann's hours of work. (Tr., p. 31) The Golf Chairman individually oversaw Tiedemann's work, and both the Club President and Golf Chairman would check up on Tiedemann and tell him how to operate the golf business. (Tr., p. 32) Tiedemann reported to the General Manager on a daily basis, (Tr., p. 32), and had to get approval from the Golf Chairman for time off; (Tr., pp. 51, 95); although he did not ask for the Golf Chairman's approval every time he took time off from work. (Tr., pp. 96-97) NHCC provided Tiedemann's lunch each day. (Tr., p. 32;) Tiedemann used his own letterhead for correspondence. (Tr., p. 85)
Tiedemann ran all of the golf tournaments; (Tr., p. 27); and other golf events at NHCC, and was responsible for "[promoting] golf activities for members and guests." (1994/95 Contract, § 4.2) The Golf Committee told Tiedemann how each of the tournaments should be run. (Tr., pp. 31, 56)
Tiedemann was responsible for ensuring that sufficient staff was available "to meet the reasonable golfing requirements of membership as mutually agreed by the professional and the golf committee." (Contract, § 4.7) Tiedemann's duties included, among other things, repairing member's golf clubs, (Contract, § 4.6), running the caddie program, (Contract, § 4.9.1), administering the driving range, (Contract 18, Item 18, § 5.4), and working with other department heads at the club. (Tr., p. 70; Contract, §§ 4.4, 4.5) In addition, Tiedemann would gather all of the daily charges incurred by members for use of the driving range, golf cart rentals, sale of merchandise, etc., and send them to the business office at NHCC. (Tr., p. 39; Contract, § 6.1) NHCC would in turn bill the members, and would compensate Tiedemann the following month. (Tr., p. 40) Tiedemann was also responsible for running the Club's golf cart program. (Contract, § 4.9) Tiedemann also had the contractual "[r]esponsibility for the initiation and operation of the Club's CT Page 12635 Junior Golf Program." (Contract, § 4.3)
During the 1994-1995 contract year, NHCC paid Tiedemann a total sum of $92,000, broken down into separate lump sum payments, and one payment based upon uses of carts per person, for the operation of the golf carts, caddies, and driving range. (Tr., p. 125) Tiedemann's expenses, i.e., costs of hiring and paying employees, maintenance and repairs of carts, golf balls, etc., were deducted from this amount. (Tr., p. 124) The record also reveals that NHCC profited from Tiedemann's services. (Tr., pp. 23, 127-28; Contract, §§ 4.9, 6.9)
Tiedemann had the contractual responsibility of "leasing golf carts to members and guests" and assisting members and guests with getting their golf bags onto and off of the carts. (Contract, § 5.5) While NHCC owned the golf carts used by its members; (Tr., p. 33; Contract, § 6.6); and paid the necessary taxes on the carts; (Tr., p. 58; Contract, § 6.6); Tiedemann was responsible for taking care of the carts. (Tr., p. 20; Contract, §§ 4.9, 5.5) Tiedemann was paid $25,000, in monthly lump sum payments, for overseeing; (Tr., p. 54; Contract, § 5.3); handling, storing, and cleaning, etc., the carts, clubs and bags. (Tr., p. 107; Contract, § 5.3) He was also paid an additional $4,000 for maintaining and repairing the carts; (Tr., p. 108, Contract, § 6.7); although NHCC assumed the costs of all materials and parts ordered by Tiedemann for the carts' maintenance and repair. (Contract, § 6.7) Tiedemann's operation expenses for carts, bags, etc., were taken out of the $25,000. (Tr., p. 124)
NHCC expressly agreed "to indemnify and hold [Tiedemann] harmless from all suits or actions, damages or costs to which [Tiedemann may have been] subject as a result of the rental of golf carts by any members and guests or by reason of injury to person or property of another." (Contract, § 6.6) The Golf Committee told him how to handle the golf cart operation, and the condition in which the carts had to be kept. (Tr., p. 31) In the event of "adverse weather," the Green Superintendent would determine whether to allow carts on the golf course, and notify Tiedemann of his decision. (Contract, § 5.5)
NHCC established the bag storage fees; (Tr., p. 81); cart fees, and guest fees to be charged by Tiedemann. (Contract, § 6.9) Tiedemann was responsible for keeping an accurate record of these charges, as well as caddie fees, and delivering the records CT Page 12636 daily to the Club's business office. (Contract, § 6.9) The money collected for use of the carts went to NHCC. (Tr., p. 44) The club would bill members for use of the golf carts, and the following month would collect the payments and give Tiedemann a fee for each cart taken out; (Tr., p. 23); $1.35/per person/per cart, as compensation for getting members bags and clubs and putting them into the carts. (Tr., pp. 34, Contract, § 5.5) All other compensation was a fixed sum. (Tr., p. 107) Tiedemann was also responsible for ensuring members' clubs were cleaned. (Tr., p. 31) Tiedemann set the fees for club repairs. (Tr., p. 113)
Tiedemann was also responsible for maintaining the caddie program. (Tr., p. 21; Contract, § 4.9.1) Tiedemann was paid $10,000 for administering the caddie program; (Contract, § 6.8); which amount included overseeing the caddies; (Tr., p. 54); and providing caddies to members. (Tr., p. 108; Item 18, § 6.8) He received this caddie master allowance in monthly lump sum payments. (Tr., pp. 52-53) Tiedemann hired and paid the Caddie Master with monies from this fund. (Tr., pp. 32, 117) He supervised the Caddie Master; (Tr., p. 117); and trained the caddies; (Tr., p. 21); although the NHCC Board of Governors told Tiedemann what tasks the caddies should perform. (Tr., p. 46)
The Golf Committee and the Board of Governors would also set, or recommend, fees to be paid to the caddies by members. (Tr., p. 21) The individual members paid a fee to the caddies each time they used their services; (Tr., p. 21); through a caddie fund. (Tr., p. 45). "The member would write up a slip with the amount that they wanted to pay the caddie. . . . And the caddie would give the caddie master a slip and [Tiedemann and his staff] would take that money out of that fund and give it to the caddie. So at the end of the day, we would tally up all the caddie slips, send it down to the office and then they would bill the member for that." (Tr., p. 45) NHCC provides the monies for the caddie fund. (Tr., p. 45)
Tiedemann also oversaw the driving range. (Tr., p. 20) NHCC provided the range; (Tr., p. 20; Contract, § 6.4); the ball retrieval cart; (Tr., p. 20); "and allied equipment, including range ball washer, cart and retriever. (Contract, § 5.4) In addition, the Club would "mow, Water and otherwise maintain the driving range area and ball retrieval equipment." (Contract, § 6.4) NHCC also assumed responsibility for the cost of repair or replacement of this equipment. (Contract, § 5.4) CT Page 12637 Further, "[t]he Club [agreed] to indemnify and hold [Tiedemann] harmless from all suits or actions, damages or costs to which [Tiedemann may have been] subjected, as a result of the use of the driving range by the members and their guests, by reason of injury to person or property of another." (Item 18, § 5.4)
Tiedemann was paid $37,000 for operating the driving range; (Tr., p. 108; Contract, § 5.4); which amount was established by NHCC's Board of Governors, and which he received in monthly lump sum payments. (Tr., p. 53; Contract, § 5.4) All of Tiedemann's expenses from operation of the driving range, exclusive of those paid by NHCC, as set forth above, but including the provision of golf balls and buckets, and hiring and paying employees, were paid with a portion of the $37,000. (Tr., pp. 20-22; Contract, § 5.4) NHCC set the fees for use of the driving range. (Tr., pp. 22, 81) The Club would bill members for use of the range and the collect payments. (Tr., p. 23) But if Tiedemann collected cash from members for use of the range, he would keep it. (Tr., p. 44) The Golf Committee told Tiedemann how to operate the driving range. (Tr., p. 31)
Tiedemann purchased workers' compensation insurance for the people he hired. (Tr., pp. 117-18; Contract, § 4.9.3) He also purchased general liability insurance and agreed to hold the Club "free and harmless" for injury arising out of the negligence of Tiedemaim or his employees. (Tr., p. 118; Contract, § 4.9.3)
The record also establishes that NHCC's insignia contains golf equipment, and the placemats used in NHCC's restaurant display a map of the Club's golf course. Further, Tiedemann used a letterhead which displayed a PGA logo, instead of the NHCC logo, although Tiedemann and the title "Head Golf Professional" were listed on the letterhead, and the only address listed was "New Haven Country Club, 160 Old Hartford Tpk., Hamden, CT 06514."
In November of 1995, the employment relationship between Tiedemann and NHCC ended. Tiedemann subsequently filed for unemployment compensation benefits. The Administrator's determination concerning Tiedemann's initial March 10, 1996 claim, was that Tiedemann was ineligible for unemployment compensation benefits because the conditions of his employment with NHCC "[did] not result in an employer-employee relationship. " CT Page 12638
Following Tiedemann's appeal from this decision, the Board of Review found that "the services [Tiedemann] provided relative to the golf carts and caddies were inextricably intertwined with and integral to the Club's provision of golf as an activity in the usual course of its business. Therefore, [Tiedemann's] functions related to these programs did not satisfy the second prong of the ABC test." The Board also found, "[a]lthough a closer question[,] . . . the driving range to be within the usual course of [NHCC's] business." Therefore, the Board of Review found that Tiedemann qualified for unemployment compensation benefits, ruling that "[b] ecause [NHCC] has not satisfied prong "B" of the independent contractor test, [Tiedemann] is deemed an employee relative to the driving range and the golf cart/caddie programs. . . . The referee's decision is modified to the extent that it is reversed relative to these functions."
 DISCUSSION I JURISDICTION
A. Standing
NHCC appeals the Board of Review's decision pursuant to General Statutes § 31-249b. Section 31-249b provides, in pertinent part, that "[a]t any time before the board's decision has become final, any party . . . may appeal to the superior court for the judicial district . . . wherein the appellant resides. . . . Any or all parties similarly situated may join in one appeal. The court has jurisdiction to hear this appeal pursuant to General Statutes § 249a(b), which provides, in pertinent part, that [a]ny decision of the board may be reopened, vacated, set aside, or modified on the timely filed motion of a party aggrieved by such decision . . . on grounds of new evidence or if the ends of justice so require upon good cause shown."
B. Timeliness
Pursuant to General Statutes § 31-249a(a), "[a]ny decision of the board, in the absence of a timely filed appeal from a party aggrieved thereby or a timely filed motion to reopen, vacate, set aside or modify such decision from a party aggrieved thereby, shall become final on the thirty-first calendar day after the date on which a copy of the decision is CT Page 12639 mailed to the party." General Statutes § 31-249a(a). The corrected decision of the Board of Review was mailed on August 21, 1997. Pursuant to § 31-249b of the General Statutes, NHCC timely filed its petition of appeal to the Superior Court with the Board of Review on September 17, 1997.
C. Exhaustion of Administrative Remedies
General Statutes § 31-249a(c) provides in pertinent part, "[j]udicial review of any decision shall be permitted only after a party aggrieved thereby has exhausted his remedies before the board, as provided in this chapter." The parties have exhausted the available administrative remedies in this matter. On August 16, 1996, after investigation by a field representative, the determination of the Administrator was mailed to Tiedemann, notifying him of the finding that he was "ineligible for benefits [because] there is no record of covered employment wages in [Tiedemann's] base period." On September 5, 1996, the Administrator's determination was appealed to an Appeals Referee, pursuant to § 31-241 of the General Statutes. On May 16, 1997, Appeals Referee Geraldine Hawthorne issued her decision to the parties, affirming the Administrator's decision that Tiedemann was ineligible for unemployment benefits pursuant to § 31-222 (a)(1)(B) of the General Statutes. On June 6, 1997, Tiedemann filed a motion to reopen the record and vacate and set aside the decision of the Appeals Referee, in accordance with General Statutes § 31-248 (b), because the record did not reflect the Internal Revenue Service's ruling that Tiedemann was an employee under federal standards. On June 9, 1997, Appeals Referee Hawthorne denied Tiedemann's motion to reopen because "[t]he ruling of the Internal Revenue Service is not material to this case." On June 9, 1997, Tiedemann appealed the Referee's May 16, 1997 decision to the Board of Review, pursuant to §31-249. On August 21, 1997, the Board of Review issued its finding that Tiedemann qualified for unemployment compensation benefits. NHCC has now filed a claim of error with this court, to determine whether the actions of the Board of Review were valid.
D. Scope of Judicial Review
Section 31-249b of the General Statutes provides in pertinent part: "In any appeal, any finding of . . . the board shall be subject to correction only to the extent provided by section [22-9] of the Connecticut Practice Book:

CT Page 12640 Section 22-9 of the Connecticut Practice Book provides: (a) Such appeals are heard by the court upon the certified copy of the record filed by the board. The court does not retry the facts or hear evidence. It considers no evidence other than that certified to it by the board, and then for the limited purpose of determining whether the finding should be corrected, or whether there was any evidence to support in law the conclusions reached. It cannot review the conclusions of the board when those depend upon the weight of the evidence and the credibility of witnesses. (Emphasis added.)
"To the extent that an administrative appeal, pursuant to General Statutes § 31-249b, concerns findings of fact, a court is llinited to a review of the record certified and filed by the board of review. The court must not retry the facts nor hear evidence . . . If, however, the issue is one of law, the court has the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion. . . ." (Internal quotation marks omitted.) Mattatuck Museum-Mattatuck Historical Society v.Administrator, 238 Conn. 273, 276, 679 A.2d 347 (1996).
 II THE APPEAL
The Board of Review determined that NHCC failed to establish that the Club's golf cart program, caddie program and driving range were not within the Club's usual course of business, and thus, that NHCC failed to satisfy prong B of the ABC test. Section 31-222 (a) 1(B) (ii) (II) of the General Statutes, providing, in relevant part, that the employer must establish that the service performed by the individual in question was "performed . . . outside of the usual course of business for which the service was performed." As set forth, infra, NHCC has the burden of proof, pursuant to § 31-222 (a)1(B) (ii) (II), regarding each of the prongs, including prong B, of the "ABC Test." Mattatuck Museum-Mattatuck Historical Society v.Administrator, 238 Conn. 273, 277, 679 A.2d 347 (1996). CT Page 12641
NHCC claims that the Board of Review's "decision and conclusions are contrary to the law and facts as set forth in the record"; (NHCC's Appeal, ¶ 12.a.); and that the Board of Review's "decision as to the second prong of the `ABC Test' was unreasonable, arbitrary, illegal and abuse of its discretion." (NHCC's Appeal, ¶ 12.b.) NHCC argues that the Board of Review's decision is erroneous because Tiedemann, as the only PGA member providing services to the club, was the only person qualified to oversee and operate the golf cart program, caddies, and driving range. NHCC further argues that, because no one employed by the Club is qualified to perform these tasks, the activities involved are not within the usual course of NHCC's business. In addition, NHCC argues that the Board of Review erred because "NHCC did not produce or distribute brochures regarding the availability of the driving range, cart or caddie program to the general public." (NHCC's Brief, p. 13) NHCC also argues that the Board of Review's decision is in error because the fact that Tiedemann used his own letterhead, which displayed a PGA symbol instead of the NHCC symbol found on all Club stationary, is evidence that he was not an employee of NHCC. Further, NHCC argues that the Board of Review's decision is in error because, although the Club's insignia contains golf equipment, and a map of the Club's golf course is found on NHCC's restaurant placemats, these findings do not evidence a continuing golf business activity. Finally, NHCC argues that, because the Club's restaurant is open year-round, but golf is not provided at the Club during the months of January and February, the restaurant is within NHCC's usual course of business, not golf.
The defendant Administrator, Unemployment Compensation Act, counters that the court is bound by the Board of Review's findings of fact and conclusions of law, and that the decision of the Board of Review "is not illegal, arbitrary, unreasonable or an abuse of discretion" because Tiedemann's services with respect to the golf carts, caddies and driving range "were inextricably interwoven with and integral to the club's provision of golf as an activity in the usual course of business under the second prong of the ABC test." (Brief of Administrator, p. 8) Tiedemann has also filed a brief arguing that "NHCC cannot satisfy prong B of the test because Tiedemann performed his services at NHCC in NHCC's usual course of business of providing golf and golf related activities." (Tiedemann's Brief, p. 4)
An individual may receive unemployment compensation benefits if he or she was an `employee' within the meaning of the CT Page 12642 Unemployment Compensation Act. In addition to defining the employer-employee relationship pursuant to the common law, §31-222 (a)(1)(B) provides that individuals who perform services for others are presumed to be employees, unless the recipient of the services (enterprise) satisfies the statutory exclusion, which is popularly known as the `ABC test.' In order for anenterprise to demonstrate that an individual was not an employee,and that the enterprise therefore has no liability forunemployment taxes under the act, the enterprise must prove thatthe individual satisfies each of the three prongs of the ABCtest. This test is conjunctive; failure to satisfy any one of the three prongs will render the enterprise subject to the act." (Emphasis added.) Mattatuck Museum-Mattatuck Historical Societyv. Administrator, supra, 238 Conn. 277.
"Under the ABC test, an individual will not be considered an employee if: [A] such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; [B] such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed;and [C] such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." (Emphasis in original; internal quotation marks omitted.) Mattatuck Museum-Mattatuck Historical Society v.Administrator, supra, 238 Conn. 277-78.
"In making our determination, we take as our starting point the fact that the act is remedial and, consequently, should be liberally construed in favor of its beneficiaries. Indeed, the legislature underscored its intent by expressly mandating that the act shall be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases. . . ." (Citations omitted; internal quotation marks omitted.) Mattatuck Museum-MattatuckHistorical Society v. Administrator, supra, 238 Conn. 278.
However, although "[t]he Unemployment Compensation Act should be construed liberally in favor of beneficiaries in order to effectuate its purpose, it should not be construed unrealistically in order to distort its purpose." F.A.S.International, Inc. v. Reilly, 179 Conn. 507, 516, 427 A.2d 392
CT Page 12643 (1980).
"First, it must be determined for whose `business' the service was performed . . . Prong B does not refer to the type of business, but, rather, to the specific business activities engaged in by the enterprise. Accordingly, with respect to this prong, we examine the particular activities engaged in by the plaintiff." Mattatuck Museum Mattatuck Historical Society, supra,238 Conn. 279.
"We next define the term `usual.' . . . `[U]sual,' in accordance with its common usage, simply means that an activity is performed by the enterprise on a regular or continuous basis. In the terms of § 31-222 (a)(1)(B) (ii) (II), if the activity is not performed on a regular or continuous basis, then the employer has satisfied prong B because the activity is `outside the usual course of the business' of the enterprise."Mattatuck Museum-Mattatuck Historical Society v. Administrator,
supra, 238 Conn. 279-80. "Prong B . . . does not compel an inquiry into the substantiality or extent of a particular business activity in relation to other activities conducted by the enterprise. . . . If . . . an enterprise undertakes an activity, not as an isolated instance but as a regular or continuous practice, the activity will constitute part of the enterprise's usual course of business irrespective of its substantiality in relation to the other activities engaged in by the enterprise." Id., 280. "In our view, `usual course of business,' as used in § 31-222 (a)(1)(B) (ii) (I), means that the enterprise performs the activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's other business activities." Id., 281.
"The determination of the status of an individual as an independent contractor or employee is often difficult . . . and, in the absence of controlling considerations, is a question of fact." (Citation omitted; internal quotation marks omitted.)Latimer v. Administrator, 216 Conn. 237, 249, 579 A.2d 497
(1990).
The record establishes that NHCC paid Tiedemann fixed yearly sums to oversee golf operations at the Club. (Tr., pp. 54, 107, 108, 125; Contract, §§ 5.3, 6.7, 6.8) The relevant findings of the Board of Review's decision are set forth below. CT Page 12644
The Board of Review found that "[t]he record discloses that [NHCC] paid [Tiedemann] a lump sum of $10,000 to initiate and maintain a caddie program, including hiring a caddie master at [NHCC's] expense to assemble, train and supervise caddies." Further, the Board found that "[a]nyone utilizing a caddie's services reaches an individual agreement with his or her caddie as to the cost of the services. [NHCC] advances the caddie's fee to the caddie, and then bills its member. [Tiedemann] received no part of the caddie's fee or any related commission."
The Board of Review also found that NHCC paid Tiedemann $4000, plus $1.35/cart/person, to operate the Club's golf cart program, where the carts were owned by NHCC, and NHCC assumed responsibility for repairing and replacing the carts, including all costs, as well as for injuries arising out of the operation of the cart by members and guests.
Further, the Board of Review found that NHCC paid Tiedemann $37,000 to operate the Club's driving range, which was not open to the public, and where the fees for the driving range were set by NHCC. Additional findings with respect to the driving range were that NHCC assumed the costs for repairing and replacing the range equipment, as well as responsibility for injury or damage claims arising out of use of the driving range by members or guests. In its decision on NHCC's motion to correct, the Board added findings that NHCC did not charge Tiedemann rent for the driving range premises and agreed to maintain the grounds of those premises. (July 14, 1998 Board of Review Decision on NHCC's Motion to Correct)
In addition, the Board of Review found that the golf insignia featured on NHCC's insignia and the map of the Club's golf course found on it's restaurant placemats signify that the Club offers golf as an activity in its usual course of business. (ROR, Item 32) Finally, NHCC receives all membership and greens fees. (July 14, 1998 Board of Review Decision on NHCC's Motion to Correct)
Based on the above factual findings, the Board of Review ruled that NHCC provided golf activity in its usual course of business, and that the golf cart and caddie programs, as well as the driving range, were integral parts of this business operation.
NHCC's argument that no one employed by the Club is qualified to perform Tiedemann's tasks, and therefore, golf is not within CT Page 12645 the Club's usual course of activity, is not persuasive. The facts establish that, although NHCC may be involved in the restaurant business, golf is also one of the business activities engaged in by the enterprise. See Mattatuck Museum-Mattatuck HistoricalSociety, supra, 238 Conn. 282 (Individuals hired to teach art courses at museum in the evenings were employees of museum because provision of the art courses was within the museum's usual course of business.) The fact that Tiedemann may have been the only person capable of performing his duties at NHCC is not relevant for purposes of prong B of the ABC test, as set forth in General Statutes § 31-222 (a)1(B) (ii) (II). See id., 279. Similarly, the fact that "NHCC purposely hired a member of a recognized profession who demonstrated a high degree of proficiency and knowledge within his profession to administer and oversee the golf operations"; (NHCC's Brief, p. 12); does not support a finding that golf is not within the usual course of NHCC's business. Rather, it could simply mean that both the restaurant and the golf activities are within the usual course of business at NHCC.
Further, although Tiedemann was the only PGA member providing services to the club, there is no evidence in the record that PGA professionals are trained to oversee golf cart programs, caddies and driving ranges. Rather, Tiedemann's testimony was that, in order to become a PGA golf professional, he was required to pass two business courses which involved studying golf carts and rules of golf. (Tr., p. 64) Based upon the facts established by the record submitted to this court by the Board of Review, including the transcript of the January 30, 1997 hearing before Appeals Referee Hawthorne and the NHCC-Tiedemann 1994-1995 contract, the Board could have reasonably, logically and lawfully reached its decision.
NHCC's argument that the Board of Review erred because the Club did not advertise its golf facilities to the general public is equally unpersuasive. To begin with, there is no evidence in the record which supports the Club's assertion that it did not advertise. The NHCC-Tiedemann 1994-1995 contract does not make any reference to NHCC advertising, nor does the testimony in the January 30, 1997 hearing transcript. Nonetheless, such a lack of public advertising does not establish that an activity is not within the usual course of business of an enterprise. Regardless of advertising, whether or not an enterprise continually engages in a particular business activity is determinative for purposes of prong B of the ABC test. Mattatuck Museum-Mattatuck HistoricalCT Page 12646Society, supra, 238 Conn. 279; General Statutes § 31-222 (a) (B) (ii) (II). Therefore, the Board of Review's decision may stand because the record submitted to the court by the Board supports a finding that the golf activities at NHCC are within the usual course of business at the Club, as contemplated by prong B of the ABC test.
The Board correctly found that NHCC's insignia contains golf equipment and that a map of the Club's golf course is prominently displayed on the restaurant placemats. NHCC's argument, that these findings of fact do not evidence a continuing golf business activity, lacks merit; it is difficult to imagine why, if NHCC is not engaged in providing golf to its members, the Club would choose to represent itself with golf symbols.
NHCC's argument that Tiedemann's letterhead is evidence of his independent contractor also lacks merit. The Board of Review correctly found that Tiedemann's letterhead is only relevant to Prong C of the ABC test and, therefore, it did not need to be considered for purposes of Prong B. Accordingly, the court need not further address this issue.
NHCC's final argument, that the Club is "specifically involved in the restaurant business"; (NHCC's Brief, p. 13); and that "NHCC does not offer golf as an activity in its usual course of business"; (NHCC's Brief, p. 13); must also fail. The Club's position is based on the fact that its restaurant is open year-round, but golf is not provided during the months of January and February. The substantiality or extent of a particular business activity, in comparison to others, is not relevant for purposes of prong B of the ABC test. Mattatuck Museum-Mattatuck HistoricalSociety, supra, 238 Conn. 280; General Statutes § 31-222 (a) (B) (ii) (II). Further, golf is a continuous business activity at NHCC during the entire golf season. The golf business does not exist in the Northeast between December and March. (Tr., p. 131, 139) In this case, the seasonal lapse between December and March does not affect the continuous business analysis under prong B of the ABC test because the golf business at NHCC operates as a continuous business activity, as is seasonably feasible, and in accordance with the general business practice established by private golf clubs and public golf courses in the Northeast. (Tr., p. 131, 139) Therefore, the Board could have reasonably found that the golf activity at NHCC was a continuous business activity in the usual course of business at the Club. CT Page 12647
Based on its findings, as set forth above, the Board of Review ruled that NHCC failed to establish that the Club's golf cart program, caddies and driving range were not a part of NHCC's usual course of business, within the meaning of prong B of the ABC test set forth in General Statutes § 31-222 (a)(1)(B) (ii) (II), and defined in Mattatuck Museum Mattatuck HistoricalSociety, supra, 238 Conn. 273.
 CONCLUSION
The Board of Review could have reasonably, logically and legally found that Tiedemann was an employee of the NHCC with respect to the performance of his duties overseeing the Club's golf cart program, caddies and driving range. The Board's decision that NHCC failed to establish prong B of the ABC test, as found in General Statutes § 31- 222(a)(1)(B) (ii) (II), is not contrary to law.
Accordingly, pursuant to § 31-249b of the General Statutes, the appeal is dismissed.
The matter is remanded for further proceedings to determine what benefits are appropriate.
The court notes that, though this decision is mandated by the existing case law, the result is illogical and unreasonable. I refer to the application of these statutory "tests" to separate, auxiliary and minor aspects of the total job function.
Anthony V. DeMayo, Judge Trial Referee